**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., | Civil Action No. _____ |
| Plaintiff, | |
| -against- | |
| EDUCATION MANAGEMENT II LLC and EDUCATION MANAGEMENT FINANCE III LLC, | |
| Defendants. | |

**COMPLAINT FOR SUCCESSOR LIABILITY**

Plaintiff The Bank of New York Mellon Trust Company, N.A. ("Plaintiff" or the "Trustee"), at the direction of Marblegate Special Opportunities Master Fund, L.P. ("Marblegate"), the beneficial holder of a majority of the Notes (as defined below), for its complaint against defendants Education Management II LLC ("New EM") and Education Management Finance III LLC ("New EM Finance" and, together with New EM, "Defendants," and, together with Education Management Corporation ("Parent EDMC") and all of Parent EDMC's direct and indirect subsidiaries, "EDMC" or the "Company"), respectfully states:

**Nature of the Action**

1.      EDMC is a for-profit post-secondary education company that owns and operates numerous educational institutions (the "Educational Institutions").  Parent EDMC owns the Educational Institutions indirectly through its subsidiaries.  Plaintiff is the indenture trustee for unsecured notes (the "Notes," and the holders thereof, the "Noteholders") issued by Education Management LLC ("Old EM") and Education Management Finance Corp. ("Old EM Finance"

1

and together with Old EM, the "Issuers").  Marblegate is the holder of nearly all of the outstanding Notes.  Prior to January 5, 2015, Old EM owned the equity in the Educational Institutions directly, and relied on the revenues from the Educational Institutions' operations to pay its obligations on the Notes.

2.      This action arises out of an out-of-court debt restructuring (the "Restructuring") devised by EDMC to coerce the Noteholders into exchanging their Notes for equity by rendering worthless the Notes held by any Noteholders who refused to consent to the exchange.  In August 2014, EDMC negotiated an agreement with a select group of its secured and unsecured creditors (the "Participating Lenders") whereby EDMC would exchange the Notes held by the Participating Lenders for a combination of stock and warrants (the "Exchange").  Notably, the Participating Lenders did not include Marblegate.

3.      In order to coerce Noteholders to consent to the Exchange, EDMC and the Participating Lenders devised a scheme to leave non-consenting Noteholders with claims against worthless shell entities.  Specifically, EDMC and the Participating Lenders agreed that certain of the holders of EDMC's secured debt (such holders, the "Secured Lenders") would "foreclose" on Old EM's assets, including the Educational Institutions, and simultaneously transfer those assets to New EM, a newly-created entity that would also be wholly-owned, indirectly, by Parent EDMC (the "Intercompany Sale").  New EM would essentially be a continuation of Old EM, but would not have a direct obligation to pay the Notes.  Additionally, the guarantees of the Notes that had been provided by Parent EDMC and the subsidiaries of Old EM would be released, so that non-consenting Noteholders could not look to other EDMC entities for payment of their debt.  ***In EDMC's own words***, the Intercompany Sale and guarantee release ensured that Old EM's assets ***"will not be available to satisfy the claims"*** of non-consenting Noteholders, and,

consequently, ***"such Holders will not receive payment on account of their Notes, including then accrued and unpaid interest."***

4.      While the Second Circuit recently vacated an earlier decision of this Court holding that the Intercompany Sale and guarantee release violated the Trust Indenture Act of 1939 (the "Trust Indenture Act"), it made clear that Marblegate is not without legal recourse. The Second Circuit stated that because Marblegate's legal right to receive payment on the Notes was left intact following the Intercompany Sale, Marblegate retains the ability to pursue other state and federal law remedies, including "State law theories of successor liability" designed to address scenarios in which "creditors foreclose on a debtor's collateral and sell the collateral to a new entity meant to carry on the business."[1]

5.      That is exactly what happened here.  EDMC's contemporaneous statements demonstrate conclusively that the Intercompany Sale was intended to have no practical effect on EDMC's operations or the ultimate ownership, governance, or control of the Educational Institutions.  Rather, New EM's sole purpose was to replace Old EM in the EDMC corporate hierarchy, and to fulfill the same business function as Old EM, by acting as the indirect, wholly-owned subsidiary of Parent EDMC that directly owns the Educational Institutions.   Upon information and belief, following the Intercompany Sale, New EM and New EM Finance had the same officers and directors as Old EM and Old EM Finance, respectively.

6.      As such, New EM and New EM Finance are mere continuations of Old EM and Old EM Finance, and the transfer of the Educational Institutions from Old EM to New EM constituted a de facto merger of those entities.  EDMC has nonetheless stated that it believes

---

[1] *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 16 (2d Cir. 2017) ("*Marblegate Appeal*").

New EM and New EM Finance have no obligations under the Notes.  Further, while EDMC has continued to make interest payments on the Notes, upon information and belief, it has done so only to avoid the declaration of an Event of Default under the Notes pending regulatory approval of a proposed sale of the Educational Institutions to a third party, and, once the sale has closed, intends to make good on its promise that obligations to non-consenting Noteholders will not be fulfilled.

7.     Despite EDMC's efforts to avoid an Event of Default, on April 27, 2017, it failed to pay all of the interest on the Notes, and did not cure this failure within 30 days, thus causing an Event of Default to exist.  As of the filing of this action, the interest payment remains outstanding and the Event of Default is continuing.

8.     Plaintiff thus respectfully seeks a judgment from this Court declaring that the doctrine of successor liability renders New EM and New EM Finance liable for the obligations owed under the Notes.

**The Parties**

9.     Plaintiff The Bank of New York Mellon Trust Company, N.A. is a nationally-chartered banking association with its principal place of business at 400 South Hope Street, Los Angeles, California 90071.

10.     Non-party Marblegate Asset Management, LLC is a Delaware limited liability company with its principal place of business at 80 Field Point Road, Suite 101, Greenwich, Connecticut 06830.  Marblegate Asset Management, LLC serves as the investment adviser to Marblegate Special Opportunities Master Fund, L.P.

11.     Non-party Marblegate Special Opportunities Master Fund, L.P. is a Cayman Islands limited partnership that is organized and maintains its registered office at 20 Genesis Close, dms House, Grand Cayman KY1-1108, Cayman Islands.  Marblegate owns approximately

4

$15 million in Notes (inclusive of accretive payment-in-kind "PIK" interest).  Marblegate directed the Trustee to commence this action.

12.     Upon information and belief, Defendant New EM is a Delaware limited liability company with its principal place of business at 210 Sixth Avenue, Pittsburgh, Pennsylvania. Upon information and belief, Defendant New EM is a direct, wholly-owned subsidiary of Education Management Holdings II ("New EM Holdings"), which is a direct, wholly-owned subsidiary of Parent EDMC.  New EM is the successor to Old EM, one of the Issuers of the Notes.

13.     Upon information and belief, Defendant New EM Finance is a Delaware limited liability company with its principal place of business at 210 Sixth Avenue, Pittsburgh, Pennsylvania.  Upon information and belief, New EM Finance is a direct, wholly-owned subsidiary of New EM.  New EM Finance is the successor to Old EM Finance, one of the Issuers of the Notes.

14.     Non-party Parent EDMC is a Pennsylvania corporation with its principal place of business at 210 Sixth Avenue, Pittsburgh, Pennsylvania.  Parent EDMC is the most senior entity in EDMC's corporate structure.

**Jurisdiction and Venue**

15.     This Court has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1332(a).

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

17.     This Court is an appropriate venue for this action because this dispute arises out of the terms of an indenture that, upon information and belief, was negotiated and signed in New York, and is governed by New York law, and the terms of various agreements governing the

Intercompany Sale, which, upon information and belief, were negotiated and signed in New York, and are also governed by New York law.

## Factual Background

### A.     The Company

18.     EDMC is one of the largest for-profit providers of post-secondary education in North America, with 102 locations in 31 states.   EDMC owns and operates numerous Educational Institutions, including The Art Institutes, Argosy University, Brown Mackie College, and South University.   The Educational Institutions offer both online and campus-based education in a variety of fields, including the arts and humanities, business, law, psychology and behavioral sciences, health sciences, and more.

19.     EDMC is headquartered in Pittsburgh, Pennsylvania, and employs approximately 16,900 full-time, part-time, and adjunct faculty and staff, primarily at the Educational Institutions.  As of October 2016, EDMC's Educational Institutions served approximately 65,000 students.

20.     Prior to delisting from NASDAQ in November 2014, EDMC reported net revenues for fiscal years 2011 through 2014 ranging from $2.3 billion to $2.9 billion.

### B.     The Notes

21.     On March 5, 2013, Old EM and Old EM Finance issued the Notes.[2]  At the time of their issuance, the Notes were guaranteed by Parent EDMC and numerous subsidiaries of the Issuers.  As of today, all of those guarantees have been stripped away.

22.     The Noteholders are entitled to semi-annual interest payments consisting of both cash and PIK interest on March 30 and September 30 of each year.[3]

---

[2] A copy of the Indenture is attached hereto as Exhibit A.

23. Upon information and belief, Old EM relied upon the proceeds derived from its direct equity interests in the Educational Institutions to satisfy its obligations on the Notes.

C. **EDMC's Pre-Restructuring Capital Structure**

24. As of June 30, 2014, EDMC had approximately $1.5 billion of debt, consisting of approximately $1.3 billion of secured debt (the "Secured Loans") and approximately $216 million in outstanding Notes. While the Secured Loans were secured by substantially all of the Company's assets, there is no intercreditor or subordination agreement governing the relationship between the Secured Lenders and the Noteholders.

D. **EDMC's Debt Restructuring**

25. On May 1, 2014, EDMC announced its intention to restructure its debt in order to reduce its leverage. Following this announcement, EDMC negotiated restructuring options with a select group of its creditors. The primary restructuring negotiations took place between EDMC and the Participating Lenders. The Participating Lenders consisted of a group of 18 asset management firms, holding 80.6% of EDMC's secured debt and 80.7% of the Notes. Marblegate was not included in these discussions.

26. On August 27, 2014, following negotiations with the Participating Lenders, EDMC announced an agreement on an out-of-court Restructuring with holders of more than 80% of both its secured and unsecured debt. The agreement was memorialized in a restructuring support agreement and the term sheet attached thereto, both dated September 4, 2014.

27. Under the relevant terms of the Restructuring, EDMC would exchange the Notes

---

[3] The Issuers owe Noteholders cash interest at a rate of 15% per annum, and PIK interest at a rate of (i) 1.0% per annum for the period from March 30, 2014 through and including March 30, 2015, (ii) 2.0% per annum for the period from March 30, 2015 through and including March 30, 2016, (iii) 3.0% per annum for the period from March 30, 2016 through and including March 30, 2017 and (iv) 4.0% per annum for the period from March 30, 2017 through and including July 1, 2018.

for a combination of stock and warrants in full satisfaction of the principal amount of, and any accrued but unpaid interest on, the tendered Notes (the "Exchange Offer").

28.    The Restructuring was originally contemplated as a two-step process.  In Step 1, EDMC's $1.5 billion of funded debt would be exchanged for a combination of new debt, non-voting preferred equity of Parent EDMC, and warrants exercisable for common stock of Parent EDMC.  In Step 2, which was conditioned upon regulatory approval of a change in control, the non-voting preferred equity and warrants would be mandatorily converted into common stock of Parent EDMC.

29.    By its terms, the Exchange Offer required 100% participation of the Noteholders.

**E.    The Intercompany Sale**

30.    In an effort to coerce Noteholders to consent to the Exchange of their debt to equity, EDMC and the Participating Lenders implemented a scheme designed to leave non-consenting noteholders with debt only at shell entities that had no ability to pay the debt. Specifically, if EDMC failed to obtain unanimous Noteholder support for the Exchange, EDMC would consummate the Intercompany Sale, in which it would "replace" the Issuers of the Notes—Parent EDMC's indirect subsidiary Old EM and Old EM's direct subsidiary Old EM Finance—in the corporate structure with newly created entities (later determined to be New EM and New EM Finance) that would now hold EDMC's valuable assets.  Simultaneously, the Secured Lenders would release their guarantee from Parent EDMC, causing Parent EDMC's guarantee of the Notes to be automatically released as well.

31.    In the offering circular for the Exchange Offer (the "Offering Circular"), EDMC explained the Intercompany Sale in detail and stated that it would occur only in the event that any Noteholders declined to exchange their Notes.  EDMC also made clear in the Offering Circular that "all of the Company's educational institutions would remain wholly-owned, indirect

subsidiaries, through New EM Holdings, of [Parent] EDMC."

32.    The Offering Circular also warned that if Noteholders refused to surrender their Notes in exchange for equity, the Intercompany Sale would eliminate their ability to receive payment or seek recovery on the Notes, stating in the question and answer section:

> **Q:  Why is it important that I tender my Notes in the Exchange Offer?**
>
> A:  In the event that any Holder or any lender under our existing credit facilities does not consent to the Proposed Restructuring, we are required under the terms of the Restructuring Support Agreement to implement the Proposed Restructuring over any such objection through the Intercompany Sale.  ***In the event an Intercompany Sale is consummated***, Holders who do not tender their Notes in the Exchange Offer will continue to have claims against the Co-Issuers and certain of our subsidiaries that currently guarantee the Notes; however, ***substantially all of our assets will have been transferred to New EM Holdings and will not be available to satisfy the claims of such Holders.  As a result, we anticipate that such Holders will not receive payment on account of their Notes, including then accrued and unpaid interest***, from and after the date the Proposed Restructuring is consummated.

33.    Thus, EDMC specifically structured the Intercompany Sale so that if any Noteholder did not consent to converting its debt into equity through the Exchange Offer, that non-consenting Noteholder would be left with debt only at entities (Old EM and Old EM Finance) that had no assets to satisfy the debt.

34.    Importantly, the Intercompany Sale's sole purpose was to effectuate the Restructuring over the objection of any non-consenting Noteholder.  Had 100% of the Noteholders agreed to accept the Exchange Offer, the Company would not have effectuated the Intercompany Sale.  It served no other operational purpose.

35.    While a substantial majority of the Noteholders agreed to participate in the Exchange Offer, Marblegate and certain other Noteholders declined.

**F.      EDMC Makes Clear that the Intercompany Sale is Intended to Have No Practical Effect on Its Operations and Control**

36.     As a for-profit higher education company, a substantial majority of EDMC's net revenue (78.6% for fiscal year 2014) is derived from federal student financial aid programs funded under Title IV.  Under Title IV, if one or more of the Education Institutions undergo a "change of control" under the standards of the applicable state or federal agency, EDMC or its Educational Institution must first obtain approval from that agency.  A foreclosure would likely constitute a change of control, and the failure to obtain the requisite approvals beforehand could result in the suspension or revocation of Title IV funding.

37.     Thus, prior to effectuating the Intercompany Sale, EDMC began communicating with the Department of Education ("DoE"), regional accrediting bodies, and state regulators in order to convince those regulators that the Intercompany Sale would not constitute a change of control.  On August 13, 2014, EDMC represented to federal regulators that the Intercompany Sale was solely a means to implement the Restructuring over objections of non-consenting creditors, and that if the Intercompany Sale were to be necessary:

> [Parent] EDMC's existing direct subsidiary, Education Management Holdings LLC (and/or certain of its current intermediate holding company subsidiaries), *would be replaced in the EDMC institutions' ownership tree* by a newly formed, wholly-owned subsidiary of [Parent] EDMC ("New EM Holdings").  *All of the Company's educational institutions would remain wholly-owned, indirect subsidiaries of [Parent] EDMC itself with absolutely no effect on ultimate ownership, governance or control*.

38.     EDMC further assured regulators that the Intercompany Sale "would not constitute a change in ownership resulting in a change of control" of the Educational Institutions under the applicable regulations because the Intercompany Sale "*would not change [Parent]*

*EDMC's status as the ultimate parent company of the institutions with 100% indirect ownership and control of the institutions*."

39.     Upon information and belief, EDMC and its Educational Institutions made substantially similar representations to various regional accreditors and state regulators throughout August to October 2014.

40.     On August 19, 2014, the DoE responded to the DoE Memorandum that it would not commit to a ruling that the Intercompany Sale would not constitute a change of control.  The DoE, instead, requested that EDMC inform it if EDMC intended to pursue the Intercompany Sale so that the DoE could review it at that time.

41.     On October 9, 2014, following the launch of the Exchange Offer, EDMC's regulatory counsel provided an e-mail update to the DoE.  EDMC stated that because some Noteholders had not consented the Exchange Offer, EDMC would pursue the Intercompany Sale.  EDMC again stressed that the Intercompany Sale would not result in a change of control, stating that:

> *the Intercompany Sale will result in the replacement or deletion of one or more of the intermediate subsidiaries between each of the institutions' Level 1 owners and their ultimate parent, Education Management Corporation* . . . . All of the Company's educational institutions will remain wholly-owned, indirect subsidiaries of [Parent] EDMC itself, with consummation of Step 1 having absolutely no effect on [Parent] EDMC's ultimate ownership or control of the institutions. . . .

> Here, *[Parent] EDMC will remain the ultimate parent company of the institutions, with 100% indirect ownership and control of the institutions*.  Additionally, each institution will remain under the same direct ownership and control of the existing EDMC subsidiary that is its Level 1 owner today.  *In no event does the Intercompany Sale change the ownership, debt structure, board, management or governance of EDMC or its institutions from what is described in the memorandum.*  Those aspects of the Restructuring are the same whether or not Step 1 is implemented by means of the Intercompany Sale.

42.     As this Court later summarized, EDMC was inviting regulators "to meet the new boss, same as the old boss."

43.     On November 25, 2014, EDMC announced that it had received all necessary regulatory approvals to proceed with the Intercompany Sale.

### G.     Marblegate's Efforts to Enjoin the Restructuring in *Marblegate I*

44.     On October 28, 2014, following Marblegate's unsuccessful efforts to negotiate changes to the Restructuring with EDMC, Marblegate filed (i) a motion for a temporary restraining order and preliminary injunction in this Court, seeking to enjoin the Restructuring and Intercompany Sale (the "Preliminary Injunction Motion"), and (ii) a complaint for declaratory and injunctive relief, seeking a declaration that the Restructuring and Intercompany Sale would violate Section 316(b) of the Trust Indenture Act and Section 6.07 of the Indenture (the "TIA Complaint").

45.     On December 15, 2014, the Court entered an order and decision denying the Preliminary Injunction Motion ("*Marblegate I*").[4]  The Court held that although Marblegate had demonstrated a likelihood of success on the merits of its claims, injunctive relief was unwarranted because, among other things, Marblegate would not suffer irreparable harm if the Restructuring and Intercompany Sale proceeded, because Marblegate could still pursue state law remedies.

### H.     EDMC Implements the Intercompany Sale

46.     Upon information and belief, EDMC created Defendants New EM and New EM Finance in preparation for the Intercompany Sale.  Upon information and belief, the purpose of these newly-created entities was to act as mirror entities serving exactly the same functions as

---

[4] *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp. (Marblegate I)*, 75 F. Supp. 3d 592 (S.D.N.Y. 2014).

Old EM and Old EM Finance.  Upon information and belief, New EM and New EM Finance had the same officers and directors as Old EM and Old EM Finance, respectively; New EM and Old EM had the same ultimate shareholder (Parent EDMC); and all of New EM, New EM Finance, Old EM, and Old EM Finance were wholly-owned indirect subsidiaries of Parent EDMC.

47.    On January 5, 2015, EDMC effectuated the Intercompany Sale by entering into an agreement entitled Private Disposition of Certain Collateral Pursuant to New York Uniform Commercial Code § 9-610 dated January 5, 2015 (the "Article 9 Agreement").  Pursuant to the Article 9 Agreement, the Secured Lenders purportedly "foreclosed" on Old EM's assets, including the Educational Institutions, and simultaneously "sold" the assets to New EM.

48.    As EDMC discussed ahead of time with its regulators, the "foreclosure" was merely a means to move assets away from the Noteholders, and was never intended to affect the ultimate ownership of the Educational Institutions.  Indeed, this Court has already expressly found that the purported foreclosure on EDMC's assets was not an exercise of the Secured Lender's Article 9 foreclosure rights "in a genuinely adversarial attempt to safeguard some recovery against a company they have come to regard as unable to pay its debts."[5]

49.    In light of the Court's ruling in *Marblegate I*, however, EDMC temporarily refrained from cutting off the Noteholders' ability to receive payment on their Notes.  Instead, EDMC entered into a Fourth Supplemental Indenture, dated January 5, 2015, which provided that the release of Parent EDMC's guarantee on the Notes included in the Restructuring was "void ab initio and of no force and effect to the extent found pursuant to a final judgment of a

---

[5] *Marblegate I*, 75 F. Supp. 3d at 615–16.

court of competent jurisdiction to be in violation of the Trust Indenture Act."[6]  Additionally, the Fourth Supplemental Indenture added New EM as a guarantor of the Notes, and provided that New EM's guarantee would be released if Parent EDMC's guarantee was released.

50.     The guarantees provided by other EDMC entities, however, were released at the time of the Intercompany Sale as originally contemplated in the Restructuring.

I.     *Marblegate II* **and the Second Circuit Proceedings**

51.     On June 23, 2015, following supplemental briefing, the Court entered a final judgment ("*Marblegate II*")[7] consistent with *Marblegate I*, and ordered that "[p]ursuant to Section 10.06(c) of the Fourth Supplemental Indenture, Education Management Corporation shall guarantee any past and future payments of principal and interest to Marblegate on their respective due dates under the March 5, 2013 Indenture."[8]

52.     EDMC appealed the *Marblegate II* ruling to the Second Circuit.  On January 17, 2017, a split panel of the Second Circuit vacated the *Marblegate II* ruling, holding that section 316(b) of the Trust Indenture Act is limited to "non-consensual amendments to an indenture's core payment terms."[9]

53.     The Second Circuit cautioned, however, that its ruling did not leave Noteholders like Marblegate without recourse.[10]  Indeed, the Second Circuit held that "[b]y preserving the legal right to receive payment, we permit creditors to pursue available State and federal law remedies," including those "under State law theories of successor liability and fraudulent

---

[6] Although the Court's opinion in *Marblegate I* was not a final judgment at that time, EDMC and the Secured Lenders agreed not to effectuate the release of Parent EDMC's guarantee on the Notes until after a final judgment was reached.  The Court entered a final judgment on June 23, 2015.

[7] *Marblegate Asset Management, LLC v. Education Management Corp. (Marblegate II)*, 111 F. Supp. 3d 542 (S.D.N.Y. 2015).

[8] *Marblegate II*, 111 F. Supp. 3d at 557.

[9] *Marblegate Appeal*, 846 F. 3d at 3.

[10] *Id.* at 16.

conveyance" when "creditors foreclose on a debtor's collateral and sell the collateral to a new entity meant to carry on the business."[11]

54.     This sentiment was also echoed by this Court and EDMC.  In the *Marblegate I* ruling, the District Court premised its denial of a preliminary injunction, in part, on the assumption that Marblegate would be able to "obtain relief from EDMC, [New] EM Holdings, or whatever other subsidiary takes hold of the assets disposed of through the Intercompany Sale."[12] EDMC also assured the Second Circuit that existing state law provides "protections to noteholders without regard to the parties' contract[.]"[13]

**J.      EDMC Announces Its Sale to the Dream Center Foundation**

55.     On or about March 3, 2017, EDMC announced that it had finalized an agreement to sell substantially all the assets of EDMC, including the Educational Institutions, to the non-profit Dream Center Foundation ("DCF").

56.     EDMC disclosed that "[t]he transaction includes all the faculty and staff of South University, Argosy University and The Art Institutes locations currently enrolling new students. It also includes a majority of the employees from EDMC's corporate offices."  Upon information and belief, the only Educational Institutions not included in the sale to DCF are 43 Brown Mackie College and Art Institute locations that EDMC had previously announced were closing.

57.     Upon information and belief, DCF will pay EDMC $50 million in cash at closing, with two additional $5.25 million payments six months and a year from closing, respectively.[14]

---

[11] *Id.*

[12] *Marblegate I*, 75 F. Supp. 3d at 29-30.

[13] Brief for Appellant EDMC at 41, *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1 (2d Cir. 2017) (No. 15-2124).

[14] Michael Stratford, *Inside the Deal to Convert a Large For-Profit College Into a Nonprofit*, POLITICO (April 11, 2017) *available at* http://www.politico.com/tipsheets/morning-education/2017/04/inside-the-deal-to-convert-a-large-for-profit-college-into-a-nonprofit-219706.

Various EDMC entities, including Parent EDMC and Defendants New EM and New EM Finance, are considered the sellers in the transaction; however, upon information and belief, DCF will make the payments to New EM.

58.     Upon information and belief, DCF will not assume any liabilities in connection with the Notes.

59.     Assuming EDMC is able to obtain regulatory approval to convert the Educational Institutions from for-profit to non-profit institutions, EDMC plans to close the sale to DCF on or about August 1, 2017.[15]

60.     Upon information and belief, the proceeds from the DCF sale will not be the only funds available to EDMC to satisfy its creditors.  Although EDMC stopped making public financial filings in 2014, its 10-K from that year identified $200 million in outstanding cash-secured letter of credit facilities to the DoE.  Upon information and belief, the cash collateral securing the letters of credit (believed to be at least $200 million) will ultimately be released to EDMC following the sale.

**K.     EDMC Does Not Intend to Repay Marblegate's Notes**

61.     On March 30, 2017, cash and PIK interest became due on the Notes.  The Issuers failed to make the interest payments when due.

62.     On March 31, 2017, the Trustee issued a notice of default declaring that the Trustee did not receive the cash portion or PIK portion of the interest payment due on the Notes, and that such failure to pay interest resulted in a default under the Indenture that would result in an Event of Default if the default was not cured or waived within 30 days.  The notice also stated

---

[15] *See id.*

that Parent EDMC and New EM effectuated automatic and unconditional releases of their guarantees of the Notes pursuant to Section 10.06 (b) of the Indenture.

63.   On April 27, 2017, the Trustee issued a Notice of Default indicating that (i) the Trustee received $1,126,492.05 in regular interest as well as $14,443.80 in default interest due on the Notes, but (ii) the Trustee had not received the $146,514 PIK portion of the payment.  The Notice also stated that if EDMC did not pay the PIK interest within 30 days, an Event of Default would exist.  EDMC failed to pay the PIK interest with 30 days of April 27.  As of the filing of this action, EDMC has not paid the PIK interest and the Event of Default is continuing.

64.   Notwithstanding the April 27 interest payment, upon information and belief, neither Defendants nor any other EDMC entity intends to make any additional payments on the Notes, including the next interest payment due on September 30, 2017.  Upon information and belief, EDMC paid the outstanding interest due on the Notes on March 30, 2017 only to avoid an Event of Default from occurring prior to the closing of the sale to DCF.  As explained above, EDMC's efforts to avoid an Event of Default failed because EDMC failed to pay the required PIK interest.

65.   Upon information and belief, EDMC will not provide any of the proceeds from the sale to DCF to Old EM or Old EM Finance so that those entities can satisfy their obligations on the Notes.  Indeed, since the summer of 2014, EDMC has made clear that it does not intend to honor its debt to Marblegate under the Notes.  The Company promised in the Offering Circular that it anticipated that holders of Notes who did not tender their notes in the Exchange Offer— like Marblegate—"will not receive payment on account of their Notes, including then and accrued and unpaid interest[.]"

66.   Defendants contend that they have no obligation to pay the Notes.

## COUNT I

### (Declaratory Judgment for Successor Liability Against
### Defendants New EM and New EM Finance)

67.      Plaintiff incorporates by reference and re-alleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

68.      An actual, justiciable controversy exists between Plaintiff and Defendants regarding whether New EM and New EM Finance have successor liability for the Notes. Defendants have taken the position that they are not liable for the obligations on the Notes.

69.      Upon information and belief, the Issuers have no assets to pay their obligations on the Notes, and no EDMC entity intends to make further payments on the Notes.

70.      EDMC executed the Intercompany Sale, and created New EM and New EM Finance, with the goal of avoiding Old EM and Old EM Finance's liabilities to Marblegate on the Notes.

71.      Following the Intercompany Sale, New EM took the place of Old EM in EDMC's corporate structure, and became the owner and operator of EDMC's only significant assets, its Educational Institutions.

72.      All of EDMC's Educational Institutions remain wholly-owned, indirect subsidiaries of Parent EDMC.

73.      According to EDMC, Parent EDMC retained "ultimate ownership, governance [and] control" over its Educational Institutions following the Intercompany Sale.

74.      Parent EDMC is the ultimate owner and parent company of both the Issuers and their mirror-image entities, Defendants New EM and New EM Finance.

75.      New EM is the de facto successor of Old EM and is engaged in a substantial continuation of its business.

76.     Thus, New EM constitutes a mere continuation of Old EM, and the Intercompany Sale was a de facto merger of New EM and Old EM.

77.     New EM Finance is the de facto successor of Old EM Finance and is engaged in a substantial continuation of its business.

78.     Plaintiff is thus entitled to a declaration that New EM and New EM Finance are liable for the Notes on a theory of successor liability to the same extent as Old EM and Old EM Finance, as the original Issuers of the Notes.

**Request for Relief**

WHEREFORE Plaintiff prays for judgment:

A.     Declaring that Defendants New EM and New EM Finance are liable for the obligations on the Notes;

B.     Awarding Plaintiff its costs, disbursements, and attorneys' fees in this action.

C.     Granting Plaintiff such other relief as is just and proper.

Dated: June 19, 2017
       New York, New York

Sean E. O'Donnell
Deborah Newman
Christopher W. Carty
Lucy C. Malcolm
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-1093
Fax: (212) 872-1002
sodonnell@akingump.com
djnewman@akingump.com
ccarty@akingump.com
lmalcolm@akingump.com

*Counsel for Plaintiff The Bank of New York Mellon Trust Company, N.A.*

19